Manuel Font, Plaintiff and Appellee, v. Viking Construction Corporation, Defendant and Appellant.

No. 8177. Argued April 23, 1941.—Decided May 23, 1941.

692

*Juan B. Soto* and *Enrique Igaravídez,* for appellant. *Rafael Rivera Zayas,* for appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

Manuel Font alleged in an action for damages that on May 4, 1938, while inspecting as manager of The Puerto Rico Cement Corporation, and with defendant's permission, the cement factory which the defendant Viking Construction Corporation was building in Cataño, Puerto Rico, he fell in a pit dug in said plant which was under the control of the defendant and which, through the latter's negligence, was completely open and without any protection at all. He alleged furthermore that he had suffered as a consequence of said fall a dislocation of his right arm, as the result of which he had to enter a hospital and was prevented from working during six days, and was compelled to spend $76 for doctor's fees and hospital expenses and endured physical and mental injuries to the amount of $10,000.

The defendant in its answer denied that it was building the cement factory; and alleged that on the day of the accident it neither occupied nor controlled said plant, but admitted that it was working in the plant installing a piping system for the transmission of power, oil, gas, compressed air, electricity, etc., and as part of said system it was installing in the pits of the plant, escape valves and pressure gauges; it denied that it permitted or consented that any person and specifically the plaintiff should walk near or inspect the work being done on the pits which exist in the factory; it denied that the plaintiff was the general manager of the Puerto Rico Cement Corporation or was empowered or authorized to inspect said pits or the works which the defendant was performing; it admitted that its work required the removal of the top of the pits but denied that there was any pit open on the day of the accident and alleged that when the pits were opened, because of work being done in them, they were always duly protected either by an employee of the defendant or by a net of iron bars; it denied that the plaintiff suffered any accident on May 4, 1938, because of a pit being opened, or that he fell in one of the pits or that this was due to any negligence of the defendant; and finally it denied that the plaintiff's right arm was dislocated because of the defendant's negligence or that plaintiff suffered damages of any kind. It admitted, however, that the plaintiff suffered an accident on said date, although the defendant does not know the causes, extent and results of the same.

As a special defense the defendant alleged that if the plaintiff fell in the pit partly through the fault or negligence of the defendant or any of its employees, there was also involved contributory negligence and carelessness on the part of the plaintiff and that this was the proximate and immediate cause of the accident; that the defendant did not authorize the plaintiff to walk in the plant unaccompanied by an employee of the defendant and that the plaintiff did walk in that fashion, accompanied by other persons, carelessly,

without looking at the ground, and looking instead toward the roof although he knew that there were pits in the factory and that work was being done in them; and finally the defendant alleged that the plaintiff fell in the pit due to the fact that he did not observe due care and diligence but instead let his sight wander toward the roof of the building, this being the proximate cause of the accident and all the resulting injuries.

After the trial was held, the lower court rendered judgment for plaintiff and condemned the defendant to pay the plaintiff $328 for doctor's fees, hospital expenses and X-ray treatment; $2,500 as compensation for the physical and mental sufferings which he endured and the permanent (partial) incapacity in the use of his right arm resulting from said accident, and $500 for attorney's fees, plus costs. The defendant appealed to this Court and assigns sixteen errors in support of its appeal, which we shall now consider in the same order in which they appear in its brief.

By the first and third errors appellant maintains that the lower court erred in rendering judgment for the plaintiff when the complaint does not allege that there was any duty on the part of the defendant with respect to the plaintiff, or to cover the pits which existed in the cement factory. The summary which we have made of the allegations of the complaint reveals that these assignments of errors are completely groundless. The plaintiff alleged that the defendant occupied the cement plant, and controlled a pit in the factory which through its negligence was opened, without any protection at all at the top, and that the plaintiff, manager of said plant, was inspecting the factory with the consent of the defendant when he fell in the pit. These allegations contain all the essential elements which must be alleged in an action for negligence, as set forth by the lower court in its opinion, which in turn was based on the case of *Miranda* v. *P. R. Ry. Light & Power Co.*, 31 P.R.R. 739, where the following is said:

"In every case involving actionable negligence there are three essential elements: The existence of a duty on the part of the defendant to protect the plaintiff from the injury of which he complains; a failure by the defendant to perform that duty; an injury to the plaintiff from such failure."

If the plaintiff, as manager of the cement factory, had a right to enter it and the defendant was in possession and control of the pit and negligently had it opened, it is clearly alleged that the defendant failed to perform its duty of observing due care with respect to the plaintiff.

In order to be able to discuss and decide the other errors assigned by the appellant, it is necessary to examine the facts which the lower court found had been proved, which facts appear in its opinion set forth in the following manner:

"After examining the documentary and parol evidence and having in mind the ocular inspection which was carried out, the court finds the following facts to have been proven.

"The plaintiff, Manuel Font, seems to be a man of about 52 years of age; he was on the day of the accident manager of the Puerto Rico Cement Corporation and a Colonel in the United States Army Reserve. The Puerto Rico Reconstruction Administration was receiving, at a cement factory which had been built by it for the Puerto Rico Cement Corporation, all the electrical equipment, pumps and piping which it had ordered from the defendant, Viking Construction Corporation. Font had been stationed at the plant throughout the period of construction, since November, 1937. On May 4, 1939, (sic) between 4:30 and 5:00 P.M., the plaintiff visited the factory accompanied by Attorney Benigno Fernández García, at that time Attorney General of Puerto Rico. There was not much light inside the building and while both were walking along the main corridor, from north to south, the plaintiff was on Mr. Fernández García's right. They took a stroll around the plant, and when returning, Font fell in a pit several feet deep, striking his right shoulder on the edge of the pit while falling. At that moment there was nobody except Font and Fernández García near the place of the accident. From the ocular inspection carried out by the court it appears that the pit was about 58 inches long, 41 inches wide and 40 inches deep. There was a corridor on each side of the pit, that on the right hand side being wider than the other; and on each side of the pit and of the corridors

which bordered it, the machines are installed in a continuous line. The pit had a grilled top which covers all its surface for purposes of protection, but at that time it was removed and placed at one side. This grilled top is of cast iron and its weight is at least 200 pounds.

"On the day of the accident and at the time when it happened, the daily work had already finished and there remained inside the factory only the engineer, Mr. David Ramírez, with an assistant inspecting with a flash-light several motors, and two employees of the defendant, Armengol Pérez and Juan Cruz Molina, who were working on the electrical power system. None of these persons was near the place of the accident and they all testified that they did not see how it happened and only knew of it after it had occurred, when they heard Font's groans. Neither Pérez nor Cruz Molina could specify in their testimony the hour when the accident occurred: the first said that he did not know but that it happened after mid-day between 2:30 and 3:00. On the other hand, Font, García and Ramírez fixed the hour of the accident after 4:30. This is the time when the day's work finishes at the factory and this explains the absence of workers with the exception of those two who have been mentioned, employees of the defendant, and the Engineer Ramírez, who had been charged with the job of inspecting the equipment delivered.

"The plaintiff Font on many occasions had walked along the same place, and knew that there was a pit but he also knew that a grilled top was placed on top of the pit when it was not in use, and the duty which the defendant had, in accordance with its contract (Art. 9, page 10, Par. 17, 18, 19, 20 and 21) of surrounding all its activities with proper protection for the public and the workers and provide all the machines, equipment and other dangerous places with lights, bars and other means of protection. On a previous occasion, Font had seen the pit opened, but surrounded by a railing with red lights.

"The inspector, Mr. Ramírez, testified that when the pit was delivered to the defendant to be utilized for the work for which it had been bought, the grilled top was in place and that on the previous day he had passed near the site of the accident, had not seen the top in its place and had called Mr. Lyons' attention to it, Mr. Lyons being the defendant's representative and overseer.

"As the result of the fall, Font suffered a severe pain which it was later proved, was due to a fracture in the larger tuberosity of the right humerus. He underwent a prolonged treatment with Dr. José Guzmán Soto spending $78 for hospitalization, medicines and X-ray

treatment; paying $50 to the doctor as part payment of the compensation for his services and still owing $200 according to the plaintiff, and $250 according to Dr. Guzmán Soto. In order that the pleadings concerning specific damages should be in harmony with the evidence, the court permitted the complaint to be amended, in the sense of adding to its sixth paragraph the sentence 'and the sum of $250 due to Dr. Guzmán Soto for his medical services'. The expert testimony of the plaintiff, corroborated almost entirely by the defendant's own experts, Doctors González Martínez and Soto Rivera, does not leave any doubt concerning the fracture suffered by Font, as a consequence of the shock and dislocation of his right arm, or concerning the functional limitation of that limb in its lateral and circular movements, or the existence of the arthritis caused by the dislocation and fracture and producing the intense pain suffered by the patient and the discomfort which he still feels when using his arm. This incapacity in a person of the plaintiff's age is of a permanent character and the limitation of his right arm can be calculated at 20 or 25 per cent of its normal functioning.''

With the exception to which we will refer when we discuss the twelfth error, we can say that these findings of fact are upheld by the evidence offered by the parties, as revealed by the transcript which forms a part of the record.

By the second error it is alleged that there was no proof that the defendant was in the exclusive possession and control of the cement factory. The essential averment of the complaint is to the effect that the defendant had the pit in the cement plant under its possession and control, and the defendant in its answer admitted that on the date of the accident it was installing in said plant the piping system and as part of the same it was equiping the pits with escape valves, and that while work was being done in said pits it was necessary to keep them opened by removing the grilled top which was put back in its place when the work was finished. These admissions of the defendant supplement the allegations of the complaint, and together with the evidence, justify fully the finding of the lower court to the effect that the defendant was in possession and control of the pit in which it was performing the above mentioned work.

■ By the fourth and fifth assignments it is alleged that the lower court erred in holding that the plaintiff was not guilty of contributory negligence and that there was no evidence in support of said allegation, and that the actions of the plaintiff were not the proximate cause of the accident. In its discussion of these errors appellant maintains that the lower court was moved by bias and prejudice in its weighing of the evidence. We have read carefully the transcript of the evidence and are of the opinion that the finding of said court was correct when it expressed itself in its opinion as follows:

"The defendant, although it so alleges expressly, did not prove that the plaintiff assumed the risks of his own acts in visiting the plant whenever he thought it necessary. The natural construction of things and of relations in official business makes us think that the plaintiff, because of his official position, had the right to visit the plant and therefore, the defendant had to prove that it did not have the duty of protecting him from accidents while on said visits. On the contrary, the evidence reveals that the plaintiff knew that the defendant had the duty of covering the pits, especially when no work was being performed in them, and he had the right to assume that after its daily chores were finished on the date of the accident, the pit would be duly covered or protected, and that this condition would not be altered or changed by the defendant. In our opinion, there was no contributory negligence on the part of the plaintiff. See the excellent discussion of this legal principle in the case of *Jorge* v. *Umpierre*, 49 P.R.R. 75. The proximate cause of the accident in the opinion of the court, was the negligence and carelessness of the defendant in failing to perform its duty of keeping the pit covered, this neglect being aggravated by reason of the fact that the work for that day in the pit had been finished, and no excuse appears from the evidence which might relieve the defendant from complying with this elementary precaution."

We take the following definitions and commentaries from Section 466 of the Restatement of the Law of Torts, second volume, dealing on Negligence, and more specifically concerning contributory negligence, as adopted and promulgated by the American Law Institute.

"The plaintiff's contributory negligence may be either (*a*) an intentional and unreasonable exposure of himself to danger created by the defendant's negligence of which danger the plaintiff knows or has reason to know, or (*b*) conduct which, in respects other than those stated in Clause (*a*), falls short of the standard to which the reasonable man should conform in order to protect himself from harm."

If we accept the theory of the defendant we would have to apply one of these two rules to the plaintiff. The clause marked with an (*a*) is not applicable because there is nothing in the evidence tending to prove that the plaintiff knew or had reason to know of the danger which existed, that is, that the defendant, through its employees, had left the pit uncovered when it had finished its work for the day. On the contrary, it was proved that the defendant, through custom or duty, either covered the pit with the grilled top or surrounded it with railings on which lights were placed, when the pit remained opened. In the same work, the following commentary is made on the clause marked with the letter (*a*):

"In order that the plaintiff's conduct may be contributory negligence of the sort described in Clause (*a*), the plaintiff must know of the physical condition created by the defendant's negligence and must have knowledge of such facts that, as a reasonable man, he should realize the danger involved. Furthermore, the plaintiff must intentionally expose himself to this danger. He must have the purpose to place himself within reach of it. It is not enough that his failure to exercise reasonable attention to his surrounding prevents him from observing the danger, . . . Last of all, his intentional exposure of himself to the known danger must be unreasonable. In order that it may be unreasonable it is necessary that a reasonable man in his position would not expose himself to it."

A mere mention of the different examples set out above is enough to make one realize that the action of the plaintiff does not fall within the scope marked with the letter (*a*), *supra*. Let us now see the commentary on the clause (*b*):

"The negligence dealt with in Clause (*b*) usually consists of plaintiff's failure to pay *reasonable attention to his surroundings* so as to

discover the danger created by the defendant's negligence, or to exercise reasonable competence, care, diligence and skill to avoid the danger *when it is perceived,* or to make such preparations as a reasonable man would regard as necessary to enable him to avoid a possible future danger.''

The facts which have been proved in this case · prevent said clause (*b*) from being applicable to the plaintiff. As we have said before, it was shown that the defendant had to keep the pits covered when the work for the day was done, since to leave them opened constituted a danger to any person walking through the plant. The plaintiff knew this and as the lower court says, had the right to assume that the pit would be covered or protected at the time when the accident occurred. As the manager of the cement factory, he had the right to enter the premises and it cannot be said that because he was showing the plant to Attorney Fernández García he failed to survey his surroundings with the reasonable attention of which the previous commentary speaks. Neither he nor his companion could see the pit which had been left opened, due to the semi-obscurity which prevailed inside the plant.

The case of *Muriel* v. *Marchán,* 21 P.R.R. 310, cited insistently by the defendant throughout its brief, is not applicable to the case at bar. The facts of these two cases are completely different. The following paragraph from the opinion of this Court in said case clearly shows this:

''The court found further in its opinion that of the allegations of the complaint only those which referred to the fall and the injuries had been proven; *that the negligence of the defendant had not been proved and the accident could only have occurred through the inexcusable negligence of the complainant;* that a building without interior partition and with the doors and windows in its two floors as enumerated, *which, according to the evidence of the plaintiff himself were open, was undoubtedly sufficiently lighted so that any person of ordinary caution could have seen the opening and avoided falling through it;* that the opening was in a place where it could have been seen by the plaintiff before arriving at it, for although the rail-

702

ing of the stairway is near it, the railing is composed of balusters sufficiently far apart to allow it to be seen; *that in relation to the floor and the light of the two stories, this opening is something like a colored window and could have been unnoticed only by great negligence.*" (Italics supplied.)

The *ratio decidendi* in that case was that the plaintiff failed to prove the negligence of the defendant and that on the contrary the contributory negligence of the plaintiff was proved. The accident occurred in the clear light of day, at a time when Muriel could easily have seen the hole through which he fell. There · is a striking difference therefore, between the facts of the *Muriel* case and those of the case which we are now deciding.

██ In the sixth assignment of error it is alleged that the lower court erred in holding that this is an action *ex-contractu* and that even if it were an action *ex-delicto,* there was the duty on the part of the defendant with respect to the plaintiff, and the following incomplete paragraph is cited from the opinion of the lower court, in support of appellant's contention:

". . . . Aside from that, the defendant had this duty to perform in accordance with its contract and even though the cause of action of the plaintiff does not spring from the contract, and this action is not therefore, *ex-contractu,* the duties imposed on the defendant by its contract with the Puerto Rico Reconstruction Administration by which it bound itself to take all necessary measures for the protection of persons against injuries, said measures being expressly defined in the contract, can be properly admitted in evidence, not for the purpose of basing the claim on them, but to prove the duty of the defendant to protect the plaintiff from injuries. Aside from that, defendant's duty arises unimpeachably when one considers the nature of the place where the accident occurred and the other circumstances which the evidence reveals."

The part of the paragraph not cited by the defendant reads as follows:

"The plaintiff, as manager of the Puerto Rico Cement Corporation, had a perfect right to visit the plant. He had been doing this since

November, 1937, and Aronson, a witness for the defendant, admits in his testimony that these visits took place. The nature of his office carried with it the right to inspect that which is or is going to be under his direction. The defendant had to show that the natural course of events did not take place in this case. As the place where work was being done was small and dark and as the pit was located in the middle of a corridor, the hole being long, wide and deep, and on the very level of the floor, the defendant had the duty, as a matter of the most elementary diligence and care, of keeping this pit closed with its grilled top, especially when no work was being performed in it and still more when the work for the day had been finished. The defendant had this duty not only with respect to the plaintiff but also with respect to any person whether he was an employee or not, who had the right to walk near that place.''

The lower court did not base its decision on the contract which was admitted in evidence unnecessarily but instead expressly states that the action is one *ex-delicto* and not *ex-contractu*. The error in admitting the contract, if any was committed, was harmless, as decided in the case of *Lewis* v. *La Nier, et al.*, 270 Pac. 656, cited by the appellant, where the following was said:

''The plaintiff offered in evidence, and the court, on objection, refused to receive, the following provisions of the contract between the state and the defendants: (they are copied).

''If the purpose was to show that the plaintiff may sue the defendants for negligently causing the death of her husband, the rejection of the exhibit was harmless, because the defendants concede, and the case was tried on the theory, that she has the right to sue. Independently of the contract, she has that right. C. L. Secs. 6303, 6304.

''If the contention is that the defendants are liable in this action for a failure to do the things specified in the contract between the state and the defendants, regardless of whether or not such failure constituted negligence, the contention cannot be sustained. This is an action based on negligence; it is pleaded as such; it was tried and submitted to the jury as such. The measure of the defendants' duty in this case is to be determined by the law governing negligence cases, not by the provisions of the contract.''

What we have said here decides not only the sixth but also the fourteenth assignment of error, which concerns the admission of the contract in evidence.

■ In the seventh and twelfth assignments of error it is alleged that the court erred in admitting evidence concerning specific damages in the general action for damages and in granting $328 for hospital expenses, doctor's fees, etc., when only $76 were claimed in the complaint.

In its opinion, the lower court expresses itself as follows with respect to these specific damages:

". . . . In order that the allegations concerning specific damages be in harmony with the evidence, the court permitted the complaint to be amended in the sense of adding to the sixth count the sentence 'and the sum of $250 for medical services rendered by Dr. Guzmán Soto.' "

What the court really decided, as appears at page 23 of the transcript of the evidence, was the following:

"Judge:—The court, using its discretion, is going to permit the amendment of the complaint for the purpose of considering, *within the general allegation of damages,* the determination of the amount, *but not for the purpose of considering this alleged sum of $250 as specific damages since the only specific damages claimed in the complaint are the $76 paid to the Díaz García Clinic."* (Italics supplied.)

The errors were committed and will be considered upon rendering judgment, since they are not sufficient to bring about by themselves the reversal of the judgment rendered by the lower court.

■ The eighth and thirteenth assignments of error allege that the lower court erred in holding that it had been proved that the Puerto Rico Reconstruction Administration was receiving the work performed by the defendant and in holding that the Engineer Ramírez was an Inspector of the factory connected with the contract of the defendant. These holdings of the lower court are unimportant to its final decision of the case, since the fact of the defendant's negligence

did not depend on whether it was proved that the Puerto Rico Reconstruction Administration was receiving the work performed by the defendant or whether Mr. Ramírez was an inspector of the defendant.

 The defendant appellant maintains in its fifteenth assignment of error that the lower court erred in holding that the plaintiff was an invitee of the defendant. We do not find anything in the opinion of the lower court tending to show that said court applied the doctrine that the plaintiff was an invitee of the defendant, to decide the case. On the contrary, in the opinion, as we have seen before, it is stated that the plaintiff, as manager of the Puerto Rico Cement Corporation visited the plant in his own right and that the defendant knew of said visits and never objected to them. The fact that the plant, with respect to those installations with which the defendant was equipping it, had not been delivered to the Puerto Rico Reconstruction Administration, did not affect in the least the appointment of the plaintiff as manager and his right as said manager to enter the plant. Samuel Aronson, witness for the defendant, in his testimony, answered the questions numbered 17, 18 and 22 in the following way:

"17. Do you know the person who it is alleged fell in this pit, and if so, do you know whether that person was acquainted or not with the work being done at the plant by your Company?

"A. Yes, Manuel Font. He had already been appointed head of all the manufacturing work which the plant was going to do. He had a full knowledge of the plans and specifications of the building.

"18. Did he visit the plant frequently?

"A. *Yes he did.*

" * * * * * * *

"22. Was it customary for Mr. Font to walk through the plant showing visitors the different machinery installed therein?

"A. He did show several visitors through." (Italics supplied.)

In other words, the defendant knew and admitted that the plaintiff was the manager of the plant and that he visited it frequently either alone or accompanied by other persons,

706

and there is nothing in the evidence tending to show that the defendant ever objected to said visits. No error was committed.

The sixteenth assignment of error alleges that the lower court admitted evidence of facts which had occurred after the filing of the complaint and which were not alleged in it. The evidence to which the defendant objected, as it is summarized in defendant's brief, refers to the testimony of Dr. José de Guzmán Soto and the admission of some X-rays pictures which said doctor took of the plaintiff on May 31, 1938, that is, thirteen days after the complaint was filed in this case on May 17, 1938. The main reason for the defendant's objection to the admission in evidence of said pictures was that in the complaint it was alleged that the plaintiff suffered a dislocation of his right arm and the witness's testimony and the X-ray picture showed that what he had was a fracture of said arm. The error in admitting this evidence constituted an essential variance as the appellant maintains, if it were not for the fact that its own evidence and the testimony of its witness, Dr. Isaac González Martínez, showed that the X-ray picture which was taken of the plaintiff immediately after the accident, was defective and induced Dr. González Martínez to state that there was no evidence of a fracture, but when he compared it with the other picture brought by Dr. Guzmán Soto, he testified that it did show a fracture. Dr. González Martínez explained what happened as follows:

"Witness: Well, these X-ray pictures show a fracture. Now, let me explain in relation to this that I saw an X-ray picture which Mr. Font showed me . . . Mr. Font, several weeks later showed me another X-ray picture in which a fracture—this fracture—appeared. *Then I asked Font to leave this X-ray picture with me so that I could compare it with the one taken by my assistant. I compared it and I could then see in that said X-ray picture what my first inspection, of it had not revealed, because it was obscure, but the same line of fracture which appears here can be seen in the X-ray picture taken by my assistant.*" (Italics supplied.)

Sections 136, 137 and 138 of the Code of Civil Procedure provide as follows:

"Section 136.—No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it appears that the party has been so misled, the court may order the pleading to be amended, upon such terms as may be just.

"Section 137.—When the variance is not material, as provided in the last section, the court may direct the fact to be found according to the evidence, or may order an immediate amendment, without costs.

"Section 138.—Where, however, the allegation ·of the claim or defense, to which the proof is directed, is unproved, not in some particular or particulars only, but in its general scope and meaning, it is not to be deemed a case of variance, within the last two sections, but a failure of proof."

This Court, construing said provisions and citing decisions in support of its construction, expressed itself through Mr. Justice De Jesús, in the case of *Carrasquillo* v. *Ripoll; Maldonado, Int.*, 56 P.R.R. 375, 381, as follows:

"The aim of the law is to mete out justice. The rules of procedure, such as those of evidence, are nothing else but the means to that end. Hence, an infringement of one or more of such rules may not produce any legal effect unless operating to the prejudice of the party who requests compliance therewith. Based on this principle and on the modern tendency to disregard the form where instead of facilitating the same hinders justice, the three sections above mentioned require that for a variance between the allegation and the proof to be fatal, the same must be *material*, that is, that 'it has actually misled the adverse party *to his prejudice* in maintaining his action or defense upon the merits.'

"Construing section 136, *supra*, in *Guánica Centrale* v. *Colberg et al.*, 27 P.R.R. 628, 630, this court expressed itself as follows:

" 'It is the evident intention of that section that unless there is a very substantial difference between the *allegata* and *probata, the materiality of a variance must be shown at the trial.*'

708

"In *Díaz et al.* v. *Rosado et al.*, 30 P.R.R. 476, this court similarly held as follows:

" ' "And," it has been said, "under such statutes it is not enough for a party to allege merely that he has been misled, *but it must be proved to the satisfaction of the court.* An affidavit should ordinarily be filed showing in what respect the party has been surprised and misled." 31 Cyc. 703, and cases cited.' " (Italics supplied).

In the case at bar not only did the defendant-appellant fail to prove at the trial to the satisfaction of the court the importance of the variance and that it had been misled to its prejudice, but on the contrary, its own evidence showed, through the testimony of Dr. González Martínez, that it knew that the plaintiff had suffered a fracture of his right arm and not a dislocation. In accordance with the evidence offered at the trial, not only by the plaintiff but also by the defendant, what the plaintiff should have done in this case was to amend his complaint in order to bring it into harmony with the evidence. That this Court, in appropriate cases, may consider the complaint amended, has been decided in the cases of *People* v. *Heirs of Valdés,* 31 P.R.R. 213; *Montalvo* v. *Empresa etc., et al.,* 35 P.R.R. 718; *Dragoni* v. *U. S. Fire Insurance Co.,* 36 P.R.R. 425; *Diego Agüeros & Co.* v. *Navarrete et al.,* 37 P.R.R. 756; *Ismert Hinke Milling Co.* v. *Muñoz,* 37 P.R.R. 762; *Central Pasto Viejo, Inc.* v. *A. Pérez & Hno.,* 44 P.R.R. 879; *Canals* v. *Vidal,* 53 P.R.R. 199. In the case of *People* v. *Heirs of Valdés, supra,* the Court cited with approval the following note which appears in *Ellinghouse* v. *Ajax Line Stock Co.,* L.R.A. 1916–D 841, at page 843:

"The appellate courts have been liberal in allowing an amendment of the pleadings or in regarding the amendments as made, to support the judgment, where the amendment is of such a nature that it should have been allowed by the lower court upon request, and substantial justice would be promoted by such procedure. *Under these circumstances, it is held generally that the judgment will not be reversed because of defects or omissions in the pleadings which are supplied by the proof or the pleadings of the adverse party,* or

because of a variance between the pleadings and the proof, if the sufficiency of the pleadings was not properly challenged in the lower court, or the evidence was introduced without objection, or the defect or variance appears clearly not to have affected the substantial rights of the parties; but . . . the amendment will be deemed made.'' (Italics supplied.)

We are of the opinion that the defect or omission of the complaint in this case was corrected by the evidence of the defendant and that therefore, Section 142 of the Code of Civil Procedure should be applied. This Section reads as follows:

"Section 142.—The court must, in every state of an action, disregard any error or defect in the pleading or proceedings which does not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect."

The ninth and eleventh assignments allege that the lower court committed error in its appraisal of the evidence when it held hypothetically and without any basis in the evidence that the plaintiff "necessarily had to be affected to a greater degree than another person because of his profession and the office which he held," and when it fixed the damages at $2,500, because of the mental and physical sufferings and the permanent partial incapacity which the plaintiff now has in his right arm.

The lower court, in fixing the amount of damages, expressed itself as follows:

"The court has taken into consideration, before fixing the amount of the damages suffered by the plaintiff, his discomforts, pains and sufferings, the permanent partial incapacity brought about by the arthritis which in turn was produced by the dislocation and fracture if his right arm, as well as the age and position of the plaintiff who, as an engineer and colonel of the Reserve Corps of the United States Army, necessarily has to be affected by the injury to a greater degree than another person not holding such an office or practicing such a profession."

Dr. Guzmán Soto, in describing the condition of the plaintiff, produced by the accident, testified, when cross-examined by the defendant, in part as follows:

"Q.—Tell me something Doctor, what proportion of incapacity did you say that this dislocation and fracture will produce?

"A.—Well, considering the persistent pain and its spasmodic intensity, and the limitation in the lateral and circular movement of the arm, I think that a 20 or 25 per cent incapacity has been brought about in the function of the right arm.

"Q.—Tell me something Doctor, after the fracture has healed, will the patient ever recover the normal functioning of his right arm?

"A.—At first I thought he would, but the persistence of the symtoms in spite of the treatment and the lapse of time, and considering, as I have said before, the age of the injured party, I now consider it a permanent condition.

"Q.—In regard to that partial incapacity which you . . . .

"A.—Yes, sir. I do not think that this incapacity will progress further. It might improve, but that is uncertain, I cannot say for certain if it will improve after many years."

The plaintiff, who had already testified that he had practiced for 26 years his profession as an engineer, when asked of the mental sufferings he had endured as the result of the injury, expressed himself as follows:

"A.—You may imagine the suffering and the worry which I went through when I received that injury on my right arm . . . a person like me who has no other means of existence but his work, running the risk of becoming incapacitated from his right arm totally or partially. I need my right arm because I draw, I use the transit, I climb scaffoldings, I climb stairs, I practice target shooting in the Army and now I can no longer do this.

"Q.—You cannot engage yourself in target shooting now?

"A.—In the Army I was classified as an expert in the use of the pistol and the other day, at Senator Iriarte's farm, I could not even reach a marksman's classification."

And further on, the plaintiff said:

"Q.—You say that you are a Colonel in the Army?

"A.—I am a Colonel in the Reserve Corps of the United States Army.

"Q.—Does that mean that you have been called . . . you may be called to active service at any moment?

"A.—I am called to serve every summer.

"Q.—And in the case of national emergency?

"A.—Likewise.

"Q.—Will you serve with the same rank?

"A.—Well, I might be promoted to General.

"Q.—What are the impediments which you have at present in the use of your arm?

"A.—Well, I cannot move it as freely as I can my left arm, which I can move in all directions, either raising it or moving it sidewise.

"Q.—You can't?

"A.—I mean I cannot move it as freely, and even when I can move it I feel a certain discomfort . . . . I cannot hold the pistol firmly in my right arm and I cannot walk . . . I cannot move it this way and I cannot protect myself. I have always protected myself with my arms and the fact that I can no longer do so has created in me a psychology of fear, and these matters . . ."

When cross-examined by the defendant, with respect to this aspect of the case, the plaintiff answered as follows:

"Q.—Tell me, witness, how much do you earn at present?

"A.—$7,000.

"Q.—You have not suffered any loss in salary due to your injury?

"A.—None.

"Q.—You carry out the duties of your office at present with the same efficiency as before, is that not so?

"A.—I would not say with the same efficiency, with a constant pain, I do not think that I can carry them out as well as before.

"Q.—Perhaps not subjectively. But with respect to the duties of the office which you hold and the opportunity of earning money, you are on the same level as before?

"A.—Well, perhaps, but . . .

"Q.—And of course, you have not lost your chance for a promotion in the United States Army. You are still . . . .

"A.—Well, I would have to undergo a physical examination."

The evidence for the plaintiff, with respect to the consequences of the injuries which he suffered, not only was not contradicted by the evidence for the defendant, but was

corroborated by the testimony of its expert witnesses, Doctors I. González Martínez and M. Soto Rivera. The former replied to the defendant's question:

"Q.—Tell me something, could you state to the court whether if he had to keep his arm in a state of immobility it could degenerate in a permanent incapacity?

"A.—Well, it is very difficult for me to answer that question after a mere inspection of an X-ray plate, without a physical examination and without having tested his nerves or having carried out a functional test of his muscles. However, we must take into consideration a very important factor: I said that generally this does not create an incapacity in young people. *Mr. Font, however, is an old man so that he may be left with an incapacity in his arm since fractures do not heal as well in the old as in the young.*" (Italics supplied.)

And Dr. Soto Rivera said:

"Q.—Can you determine, after seing this X-ray picture, the character of the incapacity in his arm?

"A.—Well, taking into consideration the position of the fracture, it is not a total incapacity; because of said position, a total incapacity could not be produced. With respect to the possibility of the fracture causing pain, neuralgias or algesia *that might remain for a long time, sometime, perhaps years. In young people said discomforts disappear, but in persons of Mr. Font's age, as the doctors have said here, this condition is much more serious and cometimes remain for many years. He might suffer these discomforts permanently; however, the incapacity could never be total.* It might be that Mr. Font, because of the place where the fracture healed, might have some difficulties as he says in moving his arm upwards. That is possible. And it could also happen that in moving his arms backwards he might feel certain discomforts which might become permanent due to the fact that Mr. Font, as the other doctors have said, *is somewhat advanced in years.*" (Italics supplied.)

The experts for both parties are in agreement therefore, with respect to the point that in the case of a person of the plaintiff's age, that is, fifty years old, a fracture like the one he suffered might leave a permanent partial incapacity and might make him feel pains and neuralgias for a long time,

possibly years. That the trial court could take into consideration the profession and office of the plaintiff with respect to their being affected by his partial incapacity, cannot admit discussion. What the defendant maintains in its brief is that ''mental suffering'' cannot be included in the ''mental damages'' which the plaintiff alleges in his complaint to have suffered. And the defendant also says: ''if the complaint had included mental sufferings, then perhaps, through the proper evidence, the judgment of the lower court could be upheld.'' The distinction which the defendant establishes is too technical. An allegation of ''mental damage'', either does not mean anything or must be the equivalent to the concept of ''mental sufferings''. Logically, there can be no mental damages other than mental sufferings which the defendant admits constitute an object of compensation. That the evidence of the parties showed that the plaintiff endured said sufferings besides remaining with a permanent partial incapacity of a 20 to 25 per cent in the functioning of his right arm does not admit discussion either. In accordance with these facts, proved by the evidence, the trial court did not commit error in setting the damages at $2,500.

There remains to be considered the tenth assignment of error by which appellant alleges that the trial court erred in holding that the defendant was obstinate in refusing to meet the claim and as a result in condemning him to pay $500 for the fees of the plaintiff's attorney. The court a quo, setting forth the reasons which it had to hold that the defendant was obstinate in so acting, expressed itself as follows in its opinion:

''In condemning the defendant to pay the attorney's fees incurred by the plaintiff, the court has acted moved by the belief that the defendant Viking Construction was unjustifiably obstinate in its refusal to meet the claim. The defendant filed every conceivable pleading and defense in opposition to the complaint. It even denied that the accident had happened, although it admitted in another part of its answer that something had happened, but that

it did not know the causes, extent and consequences of the event. It seems that the defendant did not take much trouble in investigating the facts nor did it uphold with the proper evidence its allegation that the plaintiff was walking near the place of the accident, and although familiar with the risks involved, was looking at the ceiling of the building in an attitude of complete indifference. The defendant's case, built upon this premise, extensive allegations and defenses, was not proved and showed that is had no real defenses to interpose against the complaint filed by the plaintiff.''

The defendant, while arguing this assignment, calls the attention of the court to the fact that it answered the complaint within the term granted by law, without filing any dilatory motions of any kind and alleged furthermore that it could not consent to an excessive claim of $10,000 which the lower court itself was compelled to lower to $2,500.

The fact that the original sum claimed was lowered by the trial court is an element to be considered with respect to the amount granted as attorney's fees, but does not prevent other elements present in the case from showing the obstinacy of the defendant, as established by the trial court. In the case of *Fuentes* v. *Ganetty,* 39 P.R.R. 160, it was held that if the opposition of the defendant "had been limited to the amount of damages claimed, which was reduced by the court, the appellant then would have been in a position to argue whether or not the costs should have been imposed on her.'' When this case was decided, the concept of costs included attorney's fees and the error alleged was that said fees had not been excluded by the court.

In the more recent case of *Heirs of Mangual* v. *Hastings,* 56 P.R.R. 20, it was held that:

"The trial court did not abuse its discretion by including in the pronouncement of costs the $300 item as attorney's fees. Having given credence to the evidence for the plaintiffs, the lower court could conclude that the defendant and appellant showed obstinacy *in refusing to pay to the plaintiffs a reasonable compensation for the damages inflicted by him.''* (Italics supplied.)

Under all the concurrent circumstances of the case at bar, we are of the opinion that the trial court did not abuse its discretion when it condemned the defendant to pay $500. for attorney's fees.

For the above stated reasons, the judgment appealed from must be modified in the sense of lowering the item of $328 for expenses incurred in hospitalization, medical services and X-ray pictures, to $76, and the judgment thus modified is affirmed.